IN THE SUPREME COURT OF NORTH CAROLINA

No. 268A22

Filed 13 December 2024

SCHOOLDEV EAST, LLC

v.

TOWN OF WAKE FOREST

On discretionary review pursuant to N.C.G.S. § 7A-31 and on appeal pursuant to N.C.G.S. § 7A-30(2) (2023) from the decision of a divided panel of the Court of Appeals, 284 N.C. App. 434 (2022), affirming an order entered on 14 April 2021 by Judge Vince Rozier in Superior Court, Wake County. On 6 April 2023, the Supreme Court allowed respondent's conditional petition for discretionary review as to additional issues. Heard in the Supreme Court on 9 April 2024.

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., by J. Mitchell Armbruster, Tobias R. Coleman, and Amy Crout; and Stam Law Firm, P.L.L.C., by Paul Stam and R. Daniel Gibson, for petitioner-appellant.*

*Wyrick Robbins Yates & Ponton LLP, by Samuel A. Slater, D. Scott Hazelgrove II, and T. Nelson Hughes Jr., for respondent-appellee.*

*Robinson, Bradshaw & Hinson, P.A., by Richard A. Vinroot and Jazzmin M. Romero, for North Carolina Coalition of Charter Schools, amicus curiae.*

*Van Winkle, Buck, Wall, Starnes & Davis, P.A., by Craig D. Justus; and J. Michael Carpenter for North Carolina Home Builders Association, Inc., amicus curiae.*

ALLEN, Justice.

The public policy of North Carolina encourages "the free and unrestricted use and enjoyment of land." *Kirby v. N.C. Dep't of Transp.*, 368 N.C. 847, 852 (2016) (cleaned up). This policy advances our state's enduring commitment to property rights. *See id.* at 852–53 ("The fundamental right to property is as old as our state." (citing N.C. Const. of 1776, Declaration of Rights § XII; *Bayard v. Singleton*, 1 N.C. (Mart.) 5, 9 (1787))).

At the same time, laws enacted by our General Assembly grant counties and municipalities significant authority to adopt and enforce zoning and other land use ordinances that limit what property owners may do with or on real property. Although this Court will uphold legitimate ordinances, the state's public policy disfavoring property restrictions influences how we construe unclear or ambiguous ordinance provisions in disputes between property owners and local governments. Specifically, this Court will resolve any well-founded doubts about a provision's meaning in favor of "the free use of land." *Westminster Homes, Inc. v. Town of Cary Zoning Bd. of Adjustment,* 354 N.C. 298, 308 (2001).

The outcome of this litigation between respondent Town of Wake Forest and petitioner Schooldev East, LLC, depends on the proper interpretation of a provision in the Town's Unified Development Ordinance (UDO). The Town relied on the provision to deny petitioner's applications for permits necessary for the construction of a proposed charter school. Because the provision's meaning is unclear, the Court

of Appeals should have construed it in favor of the free use of land. The Court of Appeals instead adopted the Town's interpretation and ruled against petitioner. When properly construed, the UDO provision does not sustain the denial of petitioner's applications, which petitioner supported with competent, material, and substantial evidence. We therefore reverse the decision of the Court of Appeals and remand this case with instructions to the Town to approve petitioner's applications.

## I.  Background

Petitioner proposed to build a charter school in the Town. To that end, petitioner agreed to purchase some thirty-five acres of a roughly sixty-eight-acre tract of land owned by Jane Harris Pate and located on Harris Road. On 4 November 2019, petitioner applied to the Town for a major subdivision plan permit and a major site plan permit.[1] If granted, the subdivision permit would have resulted in the division of the Pate tract into three parcels, with petitioner's thirty-five-acre parcel in the middle. The site plan permit application sought approval for the construction of the charter school on the middle parcel (campus lot).

---

[1] As defined by the UDO, "[a] site plan is an architectural and/or engineering drawing of proposed improvements for a specific location that depicts such elements as building footprints, driveways, parking areas, drainage, utilities, lighting, and landscaping." Town of Wake Forest UDO, § 6.2.1(D). A "major site plan" refers to permit applications that "include 100 or more residential dwelling units and to all development applications which require an Enhanced Transportation Impact Analysis." *Id*. § 15.8.2(A). A "major subdivision plan" involves permit applications requiring "divisions of land into [four] or more lots, or which require dedication of public utilities and/or public streets." *Id*. § 15.9.2(A).

On 3 September 2020, pursuant to procedures outlined in the Town's UDO, the Town's planning board and board of commissioners (BOC) held a joint public hearing and quasi-judicial hearing during which petitioner's legal counsel presented evidence including maps, graphs, reports, and witness testimony in support of petitioner's applications. A substantial portion of the presentation was devoted to explaining how the applications complied with section 3.7.5 in the UDO's supplemental use standards for elementary and secondary schools, which reads in pertinent part:

> **A. For Schools in the RD[2] Zone Only:** To encourage walking and bicycle accessibility by schoolchildren to schools, it shall be required by the applicant to demonstrate how such accessibility can be achieved, given the low density nature of this district. Accommodation may include the construction of additional off-premise sidewalks, multi-use trails/paths[,] or greenways to connect to existing networks.
>
> **B. For All Schools:**
>
> . . . .
>
> 2. Connectivity (vehicular and pedestrian) to surrounding residential areas is required. Where a full vehicular connection is impractical, a multi-use trail connection shall be provided.

Petitioner's evidence indicated that petitioner intended to construct a ten-foot-

---

[2] "RD" refers to the Town's "rural holding district." A rural holding district is a district where "the principal uses of the land are restricted due to lack of available utilities, unsuitable soil types[,] or steep slopes." It is "intended for low density with the maximum density for residential developments within" the district being "1 unit per acre." The campus lot was in the Town's rural holding district.

wide multi-use path along the entire Harris Road frontage of the campus lot. The multi-use path would have provided pedestrian and bicycle access to Joyner Park, a public park across the road from the campus lot with more than three miles of paved trails. It would also have provided pedestrian and bicycle access to a future 273-home subdivision on the other side of Harris Road.

No one challenged petitioner's evidence or introduced evidence in opposition thereto. On the contrary, the Town's planning staff advised the planning board and the BOC that N.C.G.S. § 160A-307.1 prevented the Town from requiring petitioner to "install[ ] road, curb/gutter[,] and multiuse path improvements." Under that statute, "[a] city may only require street improvements related to schools that are required for safe ingress and egress to the municipal street system and that are physically connected to a driveway on the school site." N.C.G.S. § 160A-307.1 (2023).

By a four-to-three vote, the planning board recommended that the BOC deny petitioner's applications. The BOC subsequently considered the applications at its meeting on 20 October 2020. According to the UDO, each application had to comply with the following standards:

> 1. The plan is consistent with the adopted plans and policies of the town;
> 2. The plan complies with all applicable requirements of this ordinance;
> 3. There exists adequate infrastructure (transportation and utilities) to support the plan as proposed; and
> 4. The plan will not be detrimental to the use or development of adjacent properties or other

neighborhood uses.

Town of Wake Forest UDO, §§ 15.8.2(J) (major site plans), 15.9.2(J) (major subdivision plans).

The Town attorney advised the commissioners that they could not simply endorse the planning board's recommendation. Rather, they had to determine independently whether "competent, substantial, and material evidence in the record" satisfied the four UDO standards listed above.

The BOC took up petitioner's site plan first. Despite the Town attorney's admonition, the commissioners' deliberations went beyond the evidence introduced at the quasi-judicial hearing. Some commissioners worried that the proposed charter school would have a negative impact on a nearby public elementary school. One commissioner remarked that the elementary school had an occupancy level of just sixty-seven percent. Another opined that "with [the charter school] directly abutting [the elementary] school that's below occupancy," the charter school would "draw students from [the elementary school] which means less money going into [the elementary] school."

Ultimately, one of the commissioners moved to deny the site plan for lack of compliance with Standards 1 and 2.[3] With respect to Standard 1, the commissioner

---

[3] The commissioner also moved to deny the site plan application for noncompliance with Standard 4. However, the superior court later ruled that petitioner presented sufficient

asserted that the site plan was inconsistent with aspects of the Town's comprehensive plan. *See generally* N.C.G.S. § 160D-501(a1) (2023) ("A comprehensive or land-use plan is intended to guide coordinated, efficient, and orderly development within the planning and development regulation jurisdiction based on an analysis of present and future needs.").[4] In particular, the commissioner pointed to the comprehensive plan's statement that school designs should allow safe pedestrian access from adjacent neighborhoods. To justify denial under Standard 2, the commissioner highlighted the residential connectivity requirement in UDO § 3.7.5(B). The commissioners unanimously voted in favor of the motion to deny the site plan.

The BOC's discussion of the subdivision plan centered on UDO § 3.7.5(A). Several commissioners expressed their belief that the subdivision plan did not provide adequate pedestrian and cycling accessibility. The discussion then turned to whether the Town could lawfully mandate that developers construct sidewalks connecting schools to surrounding neighborhoods. The Town attorney advised the BOC that N.C.G.S. § 160A-307.1 preempted such action. The commissioners disregarded that advice and unanimously voted to deny the subdivision plan based on lack of compliance with UDO § 3.7.5(A).

---

evidence of compliance with Standard 4, and the Town did not appeal that ruling. Accordingly, this issue is not before us.

[4] When petitioner filed its applications, the relevant enabling legislation was codified in Chapter 160A. In 2019, the General Assembly consolidated and recodified the land use enabling laws into Chapter 160D. This recodification has no bearing on our disposition.

The BOC reduced its decisions to writing in two orders dated 17 November 2020. The first denied the site plan application because petitioner "failed to demonstrate compliance with UDO [§ 3.7.5(B)], which requires connectivity (vehicular and pedestrian) to surrounding residential areas." The second order denied the subdivision plan application because "the evidence submitted failed to demonstrate how the application was complying with UDO [§ 3.7.5(A)], which states that, schools in the RD zone are to encourage walking and bicycle accessibility by school children to schools."

Petitioner sought review of the BOC's orders in the Superior Court, Wake County. Following a hearing, the superior court entered an order on 14 April 2021 affirming those orders. The court rejected petitioner's contention that the denial of its applications violated N.C.G.S. § 160A-307.1. According to the court, the BOC "properly analyzed the scope of [N.C.G.S. § 160A-307.1] and determined that it did not preempt Town plans and ordinances requiring [petitioner] to demonstrate pedestrian and bicycle connectivity." The superior court further concluded, based on a review of the whole record, that the site plan failed to satisfy "the Town's plans and ordinances requiring pedestrian and bicycle connectivity" and "[a]s a result, the [BOC] properly denied both the [s]ite [p]lan [a]pplication and the [s]ubdivision [a]pplication." Petitioner appealed.

A divided panel of the Court of Appeals affirmed the superior court's order.

*Schooldev E., LLC v. Town of Wake Forest*, 284 N.C. App. 434, 448 (2022). As a threshold matter, the majority agreed with petitioner that the superior court "erred when it applied whole record review to the issue of whether the burden of production is met." *Id.* at 444 (cleaned up). The superior court "should have 'applied *de novo* review to determine the initial legal issue of whether [p]etitioner had presented competent, material, and substantial evidence.' " *Id.* (quoting *PHG Asheville, LLC v. City of Asheville*, 262 N.C. App. 231, 241 (2018), *aff'd*, 374 N.C. 133 (2020)). Nonetheless, the majority held that the superior court "correctly affirmed the [BOC's] decisions because [p]etitioner failed to meet its burden of production to show it [was] entitled to the requested permits." *Schooldev*, 284 N.C. App. at 444.

In reaching its holding, the majority acknowledged that N.C.G.S. § 160A-307.1 restricts the ability of municipalities to require street improvements for new schools. *Id.* at 447–48. The majority reasoned, however, that the statute did not control the outcome of this case because "the term 'street improvements' referred to in [N.C.G.S.] § 160A-307.1 does not include sidewalk improvements." *Id.* at 448.

Turning to UDO Standard 1 (consistency with the Town's plans and policies), the majority examined whether petitioner made a sufficient showing that its site and subdivision plans were "consistent with the adopted plans and policies of the Town." *Id.* at 449 (cleaned up). It noted that the BOC considered the comprehensive plan's policy that "school campuses shall be designed to allow safe, pedestrian access from

adjacent neighborhoods."[5] *Id.* at 450 (cleaned up). Although comprehensive plans themselves are merely advisory in nature, the majority characterized UDO § 3.7.5 as "an ordinance by which [this policy] was implemented." *Id.* at 451; *see also* N.C.G.S. § 160D-501(c) (stating that comprehensive plans "shall be advisory in nature without independent regulatory effect"). Thus, "[p]etitioner's failure to satisfy UDO § 3.7.5 was a proper basis on which the Town denied [p]etitioner's applications." *Schooldev,* 284 N.C. App. at 451.

Similarly, the majority determined that UDO Standard 2 (compliance with UDO requirements) mandated that petitioner's site and subdivision plans satisfy UDO § 3.7.5. *Id.* The majority expressly rejected petitioner's argument that UDO § 3.7.5 was a zoning ordinance and therefore was "inapplicable to [petitioner's] subdivision request." *Id.* It then explained why, in its view, petitioner's evidence did not rise to the level of competent, material, and substantial evidence.

> Our review of the record shows [p]etitioner brought forth evidence demonstrating it would dedicate a twenty-five-foot right of way line along the frontage of the property and provide a ten-foot-wide multi-use path one foot behind the right of way line. Petitioner also offered testimony tending to show the proposed sidewalk would align with

---

[5] The BOC had also concluded that petitioner's plans failed to satisfy the comprehensive plan's policy that school locations "should serve to reinforce desirable growth patterns rather than promoting sprawl." *Schooldev,* 284 N.C. App. at 437. However, because the BOC had not adopted a zoning regulation to implement this policy, the Court of Appeals majority held that the policy was "solely advisory" and thus "was not a proper basis for the [BOC] to deny the [s]ite [p]lan [a]pplication." *Id.* at 450. The Town did not seek our review of this issue.

> the entrance into Joyner Park and the trails within Joyner
> Park. Since [p]etitioner demonstrates that it would provide
> pedestrian connectivity to only one residential
> neighborhood through Joyner Park located to the south of
> the proposed school, we hold the superior court did not err
> in affirming the [BOC's] decision to deny the [a]pplications.

*Id.* at 452–53 (cleaned up).

The dissenting judge agreed that the superior court erred by applying the whole record test. *Id.* at 453 (Tyson, J., concurring in part and dissenting in part). Unlike the majority, however, the dissenting judge would have held (1) that N.C.G.S. § 160A-307.1 barred the Town from requiring petitioner and other school developers to construct "sidewalks, bike paths, trails, etc. to link . . . school campus[es] to surrounding neighborhood[s]" and (2) that "[p]etitioner clearly produced competent, material, and substantial evidence to make a *prima facie* showing of entitlement to the respective permits." *Id.* at 461, 463.

Petitioner filed a notice of appeal based on the dissent in the Court of Appeals. Although it has since been repealed, N.C.G.S. § 7A-30(2) then created a right of appeal to this Court "from any decision of the Court of Appeals rendered in a case . . . [i]n which there is a dissent when the Court of Appeals is sitting in a panel of three judges." *See* N.C.G.S. § 7A-30(2) (2023), *repealed by* Current Operations Appropriations Act of 2023, S.L. 2023-134, § 16.21(d)–(e), https://www.ncleg.gov/Sessions/2023/Bills/House/PDF/H259v7.pdf. Pursuant to N.C.G.S. § 7A-31, the parties filed petitions for discretionary review asking us to

consider additional issues. We allowed their petitions.[6]

## II.    Judicial Review of Quasi-Judicial Decisions

"Quasi-judicial decisions involve the application of ordinance policies to individual situations rather than the adoption of new policies." David W. Owens, *Land Use Law in North Carolina* 6 (4th ed. 2023). The BOC's decisions in this case qualify as quasi-judicial because in making them the BOC had to "find[ ] . . . facts regarding the specific proposal[s] and . . . exercise . . . some judgment and discretion in applying predetermined policies to the situation." *Id.*; *see also County of Lancaster v. Mecklenburg County*, 334 N.C. 496, 507 (1993) ("In the zoning context, these quasi-judicial decisions involve the application of zoning policies to individual situations, such as variances, special and conditional use permits, and appeals of administrative determinations.").

When considering permit applications in a quasi-judicial capacity, a local government board "must determine whether '[the] applicant has produced competent, material, and substantial evidence *tending to establish* the existence of the facts and conditions which the ordinance requires for the issuance of [the requested] permit.' "

---

[6] In its petition for discretionary review, petitioner asked this Court to consider whether the Town had "the statutory authority to require a school to provide off-site sidewalk improvements under the power granted by N.C.G.S. § 160A-372 (now N.C.G.S. § 160D-804)." The Town's petition requested that we determine whether the decision of the Court of Appeals majority "equate[d] to a finding . . . that the Town could require sidewalk improvements on land outside of the subdivision." We conclude at the end of this opinion that there is no need for us to decide these additional issues.

*PHG Asheville*, 374 N.C. at 149 (quoting *Humble Oil & Refin. Co. v. Bd. of Aldermen*, 284 N.C. 458, 468 (1974)). Competent evidence is evidence that is relevant and admissible. *Competent Evidence*, Black's Law Dictionary (12th ed. 2024). Material evidence has "some logical connection with the facts of the case or the legal issues presented." *Material Evidence*, Black's Law Dictionary (12th ed. 2024). Substantial evidence consists of "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Humble Oil*, 284 N.C. at 470–71 (cleaned up).

By satisfying its initial burden of production, an applicant makes a prima facie case that the permit should be issued. *Id.* at 468. The board must then grant the application unless it makes contrary findings that are likewise supported by "competent, material, and substantial evidence appearing in the record." *Id.* A decision to deny the application must rest on one or more grounds set out in the ordinance. *Id.* In short, the board must base its decision on the evidence and the text of the ordinance, not on the biases or whims of its members.

"Appeals of [a local government board's] quasi-judicial decisions go directly to superior court." Owens, *Land Use Law*, at 266; *see also* N.C.G.S. § 160D-1402(b) (2023) ("An appeal in the nature of certiorari shall be initiated by filing a petition for writ of certiorari with the superior court."). When reviewing a quasi-judicial decision by a local government board, the superior court does not function as a trial court;

rather, it "sits in the posture of an appellate court[ ] and . . . reviews th[e] evidence presented to the [local government] board." *PHG Asheville*, 374 N.C. at 149 (quoting *Mann Media, Inc. v. Randolph Cnty. Plan. Bd.*, 356 N.C. 1, 12–13 (2002)).

The superior court reviews the board's decision to determine whether it was:

    a.  In violation of constitutional provisions, including those
        protecting procedural due process rights[;]
    b.  In excess of the statutory authority conferred upon the
        local government, including preemption, or the
        authority conferred upon the decision-making board by
        ordinance[;]
    c.  Inconsistent with applicable procedures specified by
        statute or ordinance[;]
    d.  Affected by other error of law[;]
    e.  Unsupported by competent, material, and substantial
        evidence in view of the entire record[; or]
    f.  Arbitrary or capricious.

N.C.G.S. § 160D-1402(j)(1).

The standard of review used by the superior court depends on the precise issues raised on appeal. *PHG Asheville*, 374 N.C. at 150. If a petitioner alleges that the board made an error of law, the court reviews the alleged error de novo, "consider[ing] the matter anew and freely substitut[ing] its own judgment for the [board's] judgment." *Id.* (quoting *Mann Media*, 356 N.C. at 13–14); *see also* N.C.G.S. § 160D-1402(j)(2) ("The court shall consider the interpretation of the decision-making board [when reviewing an alleged error of law], but is not bound by that interpretation, and may freely substitute its judgment as appropriate.").

On the other hand, if a petitioner alleges that the board's action was

unsupported by competent, material, and substantial evidence or was arbitrary or capricious, the court undertakes a whole record review. *PHG Asheville*, 374 N.C. at 150–51. "In conducting a whole record review, the [superior] court must examine all competent evidence (the 'whole record') in order to determine whether the [board's] decision is supported by substantial evidence." *Id.* at 151 (cleaned up).

The decision of the superior court is subject to appeal. In such cases, the Court of Appeals analyzes the superior court's order for errors of law by "(1) determining whether the [superior] court exercised the appropriate scope of review and, if appropriate, (2) deciding whether the court did so properly." *Id.* (quoting *Mann Media*, 356 N.C. at 14). "In the event that the case under consideration reaches this Court after a decision by the Court of Appeals, the issue before this Court is whether the Court of Appeals committed any errors of law." *Id.*

## III.   Analysis

To examine the Court of Appeals' decision for errors of law, this Court must "make the same inquiry that the Court of Appeals was called upon to undertake in reviewing the [superior] court's order. As a result, we will now examine whether the [superior] court utilized the appropriate standard of review and, if so, whether it did so properly." *See id.*

As we have seen, whole record review is the proper standard of review for allegations that a local government board did not base its quasi-judicial decision on

competent, material, and substantial evidence. Yet the question before the superior court was not whether competent, material, and substantial evidence in the record supported the BOC's decision. Instead, the question was whether the evidence petitioner submitted to satisfy its initial burden of production amounted to competent, material, and substantial evidence. Under this Court's precedent, answering that second question "involves the making of a legal, rather than a factual, determination." *PHG Asheville*, 374 N.C. at 152. Accordingly, the Court of Appeals majority rightly held that the superior court erred by not conducting a de novo review. *Id.* at 152–53; *see also* N.C.G.S. § 160D-1402(j)(2) ("Whether the record contains competent, material, and substantial evidence is a conclusion of law, reviewable de novo.").

"If a [superior] court fails to properly make a de novo review" of alleged errors of law, "the appellate court can apply a de novo review rather than remand the case" where, as here, "the record on appeal . . . provide[s] the requisite information for the review." Owens, *Land Use Law*, at 653. Consequently, we review de novo whether petitioner met its initial burden of production.

In its principal brief to this Court, petitioner offers three main reasons for reversing the Court of Appeals majority's ruling that "[p]etitioner failed to meet its burden of production to show it met [UDO § 3.7.5] to establish a *prima facie* case for entitlement of the permits." *Schooldev*, 284 N.C. App. at 453. First, petitioner argues

that the Town exceeded its statutory authority by, among other things, erroneously relying on UDO § 3.7.5 to deny petitioner's subdivision permit request even though UDO § 3.7.5 is a zoning ordinance, not a subdivision ordinance. *See generally Lanvale Props., LLC v. County of Cabarrus*, 366 N.C. 142, 158-59 (2012) (explaining that "subdivision ordinances control the development of specific parcels of land while general zoning ordinances regulate land use activities over multiple properties located within a distinct area of the [local government's] territorial jurisdiction"). Second, petitioner maintains that N.C.G.S. § 160A-307.1 largely preempts the pedestrian and bicycle connectivity requirements in UDO § 3.7.5. Third, petitioner argues that it presented sufficient evidence of compliance with UDO § 3.7.5 and so should have been granted the requested permits in any event.

We agree with petitioner's third argument. As explained below, petitioner carried its initial burden of production by presenting competent, material, and substantial evidence of compliance with UDO § 3.7.5, and the BOC did not have before it any competent, material, and substantial evidence to support a finding to the contrary. Hence, the BOC should have approved petitioner's permit applications regardless of whether UDO § 3.7.5 qualifies as a subdivision ordinance or N.C.G.S. § 160A-307.1 preempts UDO § 3.7.5. We therefore do not reach petitioner's first two arguments.

In its brief to this Court, the Town argues that petitioner's evidence was

insufficient because UDO § 3.7.5 "does not require connectivity to just one 'surrounding residential area,' but instead to all surrounding residential areas." The Court of Appeals majority appears to have adopted the Town's interpretation of UDO § 3.7.5. *See Schooldev*, 284 N.C. App. at 453 (noting that petitioner's plans "would provide pedestrian connectivity to only one residential neighborhood").

The dispositive issue on appeal is thus whether UDO § 3.7.5 mandates pedestrian and bicycle connectivity to *all* residential areas surrounding the campus lot. To resolve this matter, we again refer to the text of UDO § 3.7.5.

> **A. For Schools in the RD Zone Only:** To encourage walking and bicycle accessibility by schoolchildren to schools, it shall be required by the applicant to demonstrate how such accessibility can be achieved, given the low density nature of this district. Accommodation may include the construction of additional off-premise sidewalks, multi-use trails/paths[,] or greenways to connect to existing networks.
>
> **B. For All Schools:**
>
> . . . .
>
> 2. Connectivity (vehicular and pedestrian) to surrounding residential areas is required. Where a full vehicular connection is impractical, a multi-use trail connection shall be provided.

Although UDO § 3.7.5(A) requires a permit applicant to demonstrate how its plans can achieve pedestrian and bicycle connectivity, it does not expressly declare that the applicant's plans must provide connectivity to *all* surrounding residential

areas. Similarly, while UDO § 3.7.5(B)(2) declares that pedestrian connectivity "to surrounding residential areas is required," it does not state that connectivity to *all* surrounding residential areas is necessary.

In some of its arguments to this Court, the Town essentially concedes that UDO § 3.7.5 is unclear. It admits that municipalities lack statutory authority to compel developers to build streets or roads outside their respective subdivisions. *See Buckland v. Haw River,* 141 N.C. App. 460, 463 (2000) (holding that the subdivision enabling statute "does not empower municipalities to require a developer to build streets or highways *outside* its subdivision"). For this reason, the Town insists that UDO § 3.7.5 should not be interpreted to require the construction of sidewalks or other improvements across land outside a developer's subdivision site. Thus, according to the Town, the term "off-premise" in UDO § 3.7.5(A) does not refer to areas outside a subdivision; rather, "off-premise" means "off the school's premises (the school's campus) but still within the subdivision site." While the Town's narrow interpretation of "off-premise" may not contradict anything in UDO § 3.7.5(A), it is not obvious from the text of the ordinance that the BOC used the term with that meaning in mind.

Furthermore, if we accept the Town's position that UDO § 3.7.5 does not mandate off-site improvements, it appears that there could be scenarios in which UDO § 3.7.5(B)(2) would not mandate pedestrian connectivity to all surrounding

residential areas. Under the Town's reading, UDO § 3.7.5(B)(2) cannot be understood to require connectivity to a surrounding residential area if providing it would entail the construction of a sidewalk or multi-use path outside the developer's subdivision. This situation might arise, for instance, where an empty lot separates the subdivision site for a proposed school from a nearby neighborhood. Perhaps the BOC did not intend the phrase "surrounding residential areas" in UDO § 3.7.5(B)(2) to include any neighborhood that does not actually share a border with the developer's subdivision site. We cannot reach that conclusion based solely on the text of UDO § 3.7.5 or related UDO provisions, however.

As if it were checkmate, our dissenting colleagues point to dictionary definitions of "surrounding" to argue that the phrase "surrounding residential areas" is not ambiguous. Specifically, they maintain that, because "surrounding" has been defined as "all around a place or thing" and "enclosing or encircling," the BOC did not need to use the term "all" in UDO § 3.7.5(B)(2) to express its intent that developers provide connectivity to every residential area located around a proposed school.

Courts often rely on dictionary definitions when construing terms in statutes or ordinances—we did so earlier in this very opinion—but this practice can do more harm than good when courts apply the definitions to manufacture a false certainty. Our dissenting colleagues ignore that modifiers such as "completely," "entirely," and "all" are commonly attached to "surrounding," "surrounded," and similar words. We

might say, for example, that a military unit is "completely surrounded" by hostile forces. Likewise, one dictionary defines "encompass" to mean "to surround *entirely*." *Encompass*, *Oxford Dictionary of English* (3d ed. 2010) (emphasis added). Another dictionary defines "surround" as "to enclose *on all sides.*" *Surround*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2007) (emphasis added). Thus, even lexicographers sometimes add modifiers to words like "surround" to ensure clarity.

Because UDO § 3.7.5 is unclear, we consult this Court's precedents on the correct interpretation of uncertain provisions in land use ordinances. These precedents instruct us to resolve any "well-founded doubts" about a provision's meaning "in favor of the free use of property." *Yancey v. Heafner*, 268 N.C. 263, 266 (1966) (cleaned up); *see also Westminster Homes,* 354 N.C. at 308 ("[A]mbiguous zoning statutes should be interpreted to permit the free use of land . . . .").

This is no arbitrary canon of construction. It reflects our state's longstanding public policy favoring the "free and unrestricted use and enjoyment of land." *Kirby*, 368 N.C. at 853 (quoting *J.T. Hobby & Son, Inc. v. Fam. Homes of Wake Cnty., Inc.*, 302 N.C. 64, 71 (1981)). That public policy recognizes and preserves the foundational place of property rights in our constitutional order. *See id.* at 852–53 ("The fundamental right to property is as old as our state." (citing N.C. Const. of 1776, Declaration of Rights § XII; *Bayard*, 1 N.C. (Mart.) at 9)). If local governments adopt ordinances that interfere with property rights, they owe it to property owners to use

plain language. *See Arter v. Orange Cnty.*, 386 N.C. 352, 352 (2024) ("Local governments have a responsibility to enact clear, unambiguous zoning rules."). Property owners should not need law degrees to figure out what local government ordinances allow them to do with their own land.

Consistent with our precedents, we resolve our doubts about the meaning of UDO § 3.7.5 against the Town and in favor of the free use of property. Thus, we do not interpret UDO § 3.7.5 to require pedestrian and bicycle connectivity to all residential areas surrounding the campus lot. Petitioner satisfied its initial burden by presenting competent, material, and substantial evidence that its proposed multi-use path would provide pedestrian and bicycle access to the public park and 273-home subdivision on the other side of Harris Road.

Because petitioner carried its initial burden of production and no one offered any evidence in opposition to its applications, the BOC had no basis on which to conclude that petitioner's applications failed to satisfy Standards 1 and 2 of the UDO. Consequently, the superior court erred by affirming the BOC's orders denying the applications, and the Court of Appeals erred in turn by affirming the superior court's order.

## IV. Conclusion

For the reasons explained above, we reverse the decision of the Court of Appeals and remand this case with instructions to the Town to approve petitioner's

site plan and subdivision plan applications. Inasmuch as our resolution of this case makes it unnecessary to reach the additional issues raised in the parties' petitions for discretionary review, we further conclude that discretionary review was improvidently allowed.

REVERSED AND REMANDED; DISCRETIONARY REVIEW IMPROVIDENTLY ALLOWED.

Justice RIGGS dissenting.

In our system of law, we develop factual records for a reason. And we, as appellate courts, understand that we should treat with deference the evidence presented to and found by decision makers. Although a trite saying, the adage "a picture is worth a thousand words" carries much significance in this matter.



The site plan map above answers so many questions about the matter at hand, but rather than examine it and meaningfully engage with what it shows, the majority ignores this evidence and renders a clear ordinance meaningless. How does it do this? By invoking the "free use of land" canon of statutory construction. That canon, though, is reserved only for ambiguous ordinances. And even when it is appropriate, it merely calls for a strict interpretation of the ordinance; the canon does not permit

a court to entirely disregard the ordinance's language. Further, the canon cannot be used to sidestep the ordinance's purpose.

Notwithstanding the ordinance's straightforward language and purpose, the majority invokes the free use of land canon to defang a legitimate local regulation of property rights. In doing so, the majority provides no clarity for what level of connectivity is required under the Town's ordinance. For these reasons, I respectfully dissent.

## I.    The Free Use of Land Canon

Municipal corporations, upon creation, "take[ ] control of the territory and affairs over which [they are] given authority." *Parsons v. Wright*, 223 N.C. 520, 522 (1943). Indeed, the very "object of incorporating a town or city is to invest the inhabitants of the municipality with the government of all matters that are of special municipal concern." *Id.* Zoning ordinances fall into this neat category, and the General Assembly has "delegated [the original zoning power] to the legislative body of municipal corporations." *Allred v. City of Raleigh*, 277 N.C. 530, 540 (1971) (cleaned up); *see also* N.C.G.S. § 160A-174(a) (2023) ("A city may by ordinance define, prohibit, regulate, or abate acts, omissions, or conditions, detrimental to the health, safety, or welfare of its citizens and the peace and dignity of the city . . . ."). Zoning laws are, thus, products of our political processes just like any other type of legislation. They "involve a reciprocity of benefit as well as of restraint" and "balanc[e] public against private interests." *McKinney v. City of High Point*, 237 N.C.

66, 71 (1953) (quoting 8 McQuillin, *The Law of Mun. Corps.* § 25.25 (3d ed. 1949)). Moreover, they are emblematic of legislation dedicated to the public welfare and serve a "fundamental purpose[ ]" in "stabiliz[ing], conserv[ing], and protecting . . . uses and values of land and buildings." *Id.* (quoting *The Law of Mun. Corps.* § 25.25).

That is not to say that "[v]ast property rights are [not] affected by zoning regulations." *Id.* As far back as 1919, this Court took notice of the rule that "all statutes in derogation of the common law are to be construed strictly" unless the common law was "changed by express enactment." *Price v. Edwards*, 178 N.C. 493, 500 (1919) (cleaned up). Among the examples noted by this Court were statutes "impos[ing] restrictions upon the control, management, use, or alienation of private property." *Id.* (cleaned up). For that exact reason, our jurisdiction and others have adopted the rule of construing ambiguous land ordinances "strictly in favor of the free use of real property." *Morris Commc'ns Corp. v. City of Bessemer City Zoning Bd. of Adjustment*, 365 N.C. 152, 157 (2011).

For example, a little under sixty years ago, in *Yancey v. Heafner*, 268 N.C. 263 (1966), we allowed the construction of a high school athletic stadium despite zoning restrictions. *Id.* at 263. Neighbors of the high school were upset about the potential lighting and noise disturbances, so they filed suit challenging the validity of the permit. *Id.* at 263, 265. When the case reached this Court, we concluded that the applicable zoning ordinance was silent as to whether athletic facilities were "forbidden in zones where schools are permitted." *Id.* at 264. To this Court, that

silence was dispositive; it signified that the city council did not contemplate prohibiting athletic stadiums and, thus we leaned on the adage that "well-founded doubts as to the meaning of obscure provisions of a [z]oning [o]rdinance should be resolved in favor of the free use of property." *Id.* at 266 (quoting 1 Yokley, *Zoning Law & Practice* § 184 (2d ed. 1962)).

Notwithstanding this canon, this Court does not find default ambiguity in order to minimize restrictions on the free use of land. *See Westminster Homes, Inc. v. Town of Cary Zoning Bd. of Adjustment*, 354 N.C. 298, 308 (2001) ("While ambiguous zoning statutes should be interpreted to permit the free use of land, . . . no such ambiguity exists here."); *see also* 1 Arthur H. Rathkopf & Daren A. Rathkopf, *Ruthkopf's The Law of Zoning and Planning* § 5:14 (Sara C. Bronin & Dwight H. Merriam eds., 2024) ("The doctrine that zoning ordinances should be construed in favor of the free use of land operates *only* where ambiguity exists." (emphasis added)); *id.* ("[T]his rule of construction favoring the free use of land should not be applied where common sense indicates the result would be contrived, unreasonable, or absurd in view of the manifest object and purpose of the ordinance.").

Indeed, in *Westminster Homes*, we abstained from invoking the free use of land canon where a conditional use permit expressly allowed homeowners to install "fences" but did not mention "gates." 354 N.C. at 300–01. In doing so, we first emphasized the importance of "ascertain[ing] and effectuat[ing] the *intention* of the municipal legislative body." *Id.* at 303–04 (emphasis added) (quoting *George v. Town*

*of Edenton*, 294 N.C. 679, 684 (1978)); *see also Long v. Branham*, 271 N.C. 264, 268 (1967) ("[C]onstruction in favor of the . . . unrestricted use, however, must be reasonable. The strict rule of construction as to restrictions should not be applied in such a way as to defeat the plain and obvious purposes of a restriction." (cleaned up)). We then achieved that goal by simply looking to the ordinance's plain language, which conveyed "a clear desire for privacy through a wide, comprehensive buffer." *Westminster Homes*, 354 N.C. at 307. Because the ordinance's text and intent were clear, there was no need to resort to statutory construction and we concluded that the permit did not allow residents to install gates. *Id.* at 308.

Here, the majority's conclusion contravenes the plain language of Section 3.7.5(B)(2). Under Section 3.7.5(B)(2), the applicant is "required" to provide "vehicular and pedestrian" "[c]onnectivity . . . to surrounding residential areas." UDO § 3.7.5(B)(2) (2013). In the event that "full vehicular connection is impractical," the ordinance indicates that "a multi-use trail connection" is an adequate replacement. The majority takes issue with this provision because "it does not state that connectivity to *all* surrounding residential areas is necessary." But that is, in fact, what this provision does.

The plain language of Section 3.7.5(B)(2) requires an applicant to connect to each residential area surrounding it. As explained earlier, the basic rule of ordinance interpretation "is to ascertain and effectuate the intention of the municipal legislative body." *Westminster Homes*, 354 N.C. at 303–04 (cleaned up). This intent is

determined "by examining [the] (i) language, (ii) spirit, and (iii) goal of the ordinance." *Capricorn Equity Corp. v. Town of Chapel Hill Bd. of Adjustment*, 334 N.C. 132, 138 (1993). "When interpreting a municipal ordinance, we apply the same principles of construction used to interpret statutes." *Morris Commc'ns Corp.*, 365 N.C. at 157 (citing *Westminster Homes*, 354 N.C. at 303). "Undefined and ambiguous terms in an ordinance are given their ordinary meaning and significance." *Id.* (citing *Perkins v. Ark. Trucking Servs., Inc.*, 351 N.C. 634, 638 (2000)); *see also The Law of Zoning and Planning* § 5:11 ("Where a word or term is not defined for the purposes of the ordinance, it will usually be given its plain, ordinary, and usually understood meaning."). Thus, it is well accepted that "courts may appropriately consult dictionaries" to "ascertain the ordinary meaning of undefined and ambiguous terms." *Morris Commc'ns. Corp.*, 365 N.C. at 158 (citing *Perkins*, 351 N.C. at 638).

According to several dictionaries, "surrounding" means "*all* around a particular place or thing," *New Oxford American Dictionary* 1751 (3d ed. 2010) (emphasis added), or "enclosing or encircling," *The Random House Dictionary of the English Language* 1916 (2d ed. 1987). Thus, the ordinary meaning of Section 3.7.5(B)(2) requires some type of effort to provide vehicular or bicycle connectivity to *all* residential areas encircling it. And this makes sense considering the plural tense of "residential areas"—the ordinance clearly requires applicants to connect the planned site with adjacent neighborhoods through streets and walkable pathways. But rather than conduct a simple dictionary check, the majority reads in an

ambiguity.[1]  The city ordinance writers did not include the word "all" in Section 3.7.5(B)(2) because "all" is necessarily implied by the word "surrounding."

Lastly, this reading of the ordinance comports with one of the listed purposes in the Town's Unified Development Ordinance.  Section 1.4, entitled "Purpose and Intent," indicates that Section 3.7.5 was adopted to "[f]acilitate walking and biking in the community by providing a well-integrated network of streets, sidewalks, bikeways, walking trails, and greenway trails," among other purposes.  UDO § 1.4 (2013).  By requiring some sort of connectivity to each neighboring residential area, an applicant may satisfy this prerequisite.  And this is no minor consideration—the level of connectivity in a neighborhood plays several roles in our everyday life, such as vehicular traffic, obesity, and happiness.  *See* Kevin M. Leyden et al., *Walkable Neighborhoods: Linkages Between Place, Health, and Happiness in Younger and Older Adults*, 90 J. of Am. Planning Ass'n 101, 101 (2024) ("We found that the way neighborhoods are planned and maintained matter[ ] for happiness, health, and trust."); Milan Zlatkovic, et al., *Assessment of Effects of Street Connectivity on Traffic Performance and Sustainability Within Communities and Neighborhoods Through*

---

[1] The majority offers a dictionary definition for Section 3.7.5(B)(2).  But rather than define "surrounding" (the adjective in the ordinance's text), the majority defines "surround"— a verb.  The difference is significant here.  Using the actual word in the text, it remains the case that there is no need to state "all surrounding residential areas" because "surrounding residential areas" necessarily implies that the ordinance requires connectivity to residential areas "all around [the subdivision]."  The majority's reading neither relies on the plain language nor the ordinance's purpose.  *See Lanvale Properties, LLC*, 366 N.C. 142, 155–56 (2012) (rejecting the proposition that "an [alleged] lack of specificity" is fatal in light of the legislation's "clear guidance").

*Traffic Simulation*, 46 Sustainable Cities & Soc'y 1, 1 (2019) ("People need to be able to travel within the community in a safe and efficient manner."); Arlie Adkins, et al., *Contextualizing Walkability: Do Relationships Between Built Environments and Walking Vary by Socioeconomic Context?*, 83 J. of Am. Planning Ass'n 296, 296 (2017) ("Supportive built environments for walking, bicycling, and transit use are predictive of a larger share of trips made by active travel modes and higher rates of walking or physical activity."). By reading in an ambiguity and invoking the free use of land canon, the majority disregards this plain reading of the UDO.

The majority also ignores the plain language of Section 3.7.5(A). Section 3.7.5(A) requires the applicant to "demonstrate how [walking and bicycle] accessibility can be achieved," given the residential district's "low density nature." UDO § 3.7.5(A) (2013). The ordinance further provides examples of how this accessibility may be accomplished: "Accommodations may include the construction of additional off-premise sidewalks, multi-use trails/paths or greenways to connect to existing networks." *Id.* Like with Section 3.7.5(B)(2), the majority also concluded this section was ambiguous because "it does not expressly declare that the applicant's plans must provide connectivity to *all* surrounding residential areas." But the majority misses the point: the plain language of Section 3.7.5(A) requires a demonstration of how the applicant plans to achieve accessibility for schoolchildren. It does not require the same proof that Section 3.7.5(B)(2) does. Because this ordinance is not ambiguous, the majority again wrongly invoked the free use of land

canon.

## II. Schooldev Failed to Meet Its Prima Facie Burden

In one sentence, the majority addresses Schooldev's prima facie burden.  Such brevity illuminates how thin Schooldev's argument is.  Schooldev presented no affirmative evidence to meet its burden under Sections 3.7.5(A) and 3.7.5(B)(2), and thus, the Court of Appeals' judgment should have been affirmed.

When determining whether to grant or deny a land use permit, the trial court first places a burden on the applicant to establish a prima facie case of entitlement to a conditional use permit.  *PHG Asheville, LLC v. City of Asheville*, 374 N.C. 133, 149 (2020) (citing *Humble Oil & Refin. Co. v. Bd. of Alderman*, 284 N.C. 458, 468 (1974)).  At this point, the applicant must produce "competent, material, and substantial evidence *tending to establish* the existence of the facts and conditions which the ordinance requires for the issuance of a [conditional] use permit."  *Id.* (emphasis in original) (alteration in original) (quoting *Humble Oil*, 284 N.C. at 468).  If this *prima facie* case is established, the agency may only deny the application "based upon findings contra which are supported by competent, material, and substantial evidence appearing in the record."  *Id.* (quoting *Humble Oil*, 284 N.C. at 468).  Those findings must contradict "grounds [ ] expressly stated in the ordinance."  *Id.* (quoting *Woodhouse v. Bd. of Comm'rs*, 299 N.C. 211, 218 (1980)).  Relevant here, the Town denied Schooldev's permit application because it failed to establish compliance with Sections 3.7.5(A) and 3.7.5(B)(2).  Thus, on appeal, the question is whether Schooldev

satisfied its prima facie burden to proffer evidence tending to prove compliance with these ordinances.

Schooldev argues that it met its prima facie burden by "presenting evidence that the campus would have a 10-foot-wide multi-use path that connects to a nearby residential neighborhood and an adjoining town park with a network [of] pedestrian paths." But Schooldev's site plan map tells a different story. To the east and west of the planned site lay undeveloped tracts of land. Residential homes along Walridge Road sit north of the school. Across Harris Road from the planned site is a 117-acre park. As the Town points out, the only accessibility or connectivity accommodation provided by Schooldev is a sidewalk that "connect[s] two of the school's driveways at the front of the school on Harris Road." Schooldev's claim that it provides connectivity is misleading, as the site plan does not include any connection to the homes to the north on Walridge Road. Schooldev incorporated no plans to connect those homes, and nothing prevented Schooldev from providing paths within its own property—the pathways did not need to be off-premises.

Statements made during the Town's planning board meeting further supports the conclusion that Schooldev did not meet its prima facie burden. During that meeting, Schooldev's counsel testified about possible conflicts with the ordinance. Everything its counsel addressed concerned the single ten-foot-wide sidewalk at the property's frontage. For biking, Schooldev's counsel asserted that the development plan was "consistent with the policy for bike ways" because it provides a multi-use

path for a community currently lacking "any pedestrian or bike way facilities." That "multi-use path" is the one sidewalk to Harris Road and the only connectivity on any of the four sides of the school. Aside from that sidewalk, Schooldev's counsel argued vaguely that "[s]tem streets . . . offer some connectivity to the adjacent undeveloped parcels if there is future development and the connectivity is possible." To Schooldev's counsel, "[t]he project *seeds* Harris Road with the multi-use pathway . . . for a walkable and bikeable community." (Emphasis added.) Because no sidewalk currently exists from the property to Harris Road, Schooldev's counsel essentially argued its plan was better than nothing and that it "begins the connection." But that is not what the ordinance plainly requires.

It is worth reiterating that ordinances are products of our political processes. Like any other legislation, a zoning ordinance "may be repealed in its entirety, or amended as the city's legislative body determines from time to time to be in the best interests of the public." *Zopfi v. City of Wilmington*, 273 N.C. 430, 434 (1968) (citing *In re Markham*, 259 N.C. 566 (1963)). It "is not a contract with the property owners of the city and confers upon them no vested right . . . to demand that the boundaries of each zone or the uses to be made of property in each zone remain as declared in the original ordinance." *Id.* at 434 (citing *McKinney v. City of High Point*, 239 N.C. 232 (1954)). In other words, if a property owner is upset with an existing ordinance, they may engage with their local legislative body. Like with many laws, any necessary fix should be primarily legislative, not judicial.

## III.    Conclusion

It is worth reiterating that ordinances are products of our political processes. Like any other legislation, a zoning ordinance "may be repealed in its entirety, or amended as the city's legislative body determines from time to time to be in the best interests of the public." *Zopfi v. City of Wilmington*, 273 N.C. 430, 434 (1968) (citing *In re Markham*, 259 N.C. 566 (1963)). It "is not a contract with the property owners of the city and confers upon them no vested right . . . to demand that the boundaries of each zone or the uses to be made of property in each zone remain as declared in the original ordinance." *Id.* at 434 (citing *McKinney v. City of High Point*, 239 N.C. 232 (1954)). In other words, if a property owner is upset with an existing ordinance, they may engage with their local legislative body. Like with many laws, any necessary fix should be primarily legislative, not judicial.

In sum, because the ordinance is not ambiguous and because Schooldev failed to meet its burden of production, I respectfully dissent from majority's decision to reverse the judgment of the Court of Appeals.

Justice EARLS joins in this dissenting opinion.